| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------X | Return Date: December 20, 2005<br><br>Chapter 7<br><br>Case No. 03-37171(CM) |

In re:

JEFFREY TOGNETTI,

                            Debtor.

------------------------------------------------------X

ERIC ROSS, and RACE CAPITAL GROUP, LLC,

           Plaintiffs,

                  -against-

JEFFREY TOGNETTI, SYNDICATE TRADING, LLC
INVESTMENT SERVICES CAPITAL CORP. d/b/a ICAP
INVESTMENT and TRADING, LLC d/b/a ICAP
and LENO S. TOGNETTI, LEIGH A. TOGNETTI, a/k/a
LEIGH A. DEMELO and DOES 1 THROUGH 10,
INCLUSIVE,

                            Defendants.

------------------------------------------------------X

Adv. Pro. No. 04-9400

SUPPLEMENTAL
AFFIDAVIT OF PLAINTIFF
ROSS

STATE OF NEW YORK )
                          )ss.:
COUNTY OF NEW YORK )

ERIC ROSS, being duly sworn, deposes and says:

    1.    I am a Plaintiff in the above-captioned action and as such I am fully familiar with the facts and circumstances set forth herein.

    2.    I submit this Affidavit in support of the instant motion, pursuant to Federal Bankruptcy Rules 9023, and 9024, to overturn the Order of this Honorable Court dated October 21, 2005, which Order dismissed, without prejudice, Adversary Proceeding 04-9400 on the

grounds that plaintiffs have failed to make a showing that there are viable fraudulent conveyance claims (the "Order"). I seek a new hearing on the issue of the standing of plaintiffs to prosecute a fraudulent conveyance claim. The instant motion is based upon the discovery of new evidence and the continuing fraudulent acts of Defendants–even during the pendency of these proceedings. Quite simply, Plaintiffs seek to prevent a manifest injustice. By this affidavit and supporting documentation, we intend to show that plaintiff maintains a colorable claim by identifying and documenting repeated fraudulent actions on the part of each of the defendants, in an effort to protect the "family's" assets from its creditors. Indeed, it appears that the Chapter 7 Trustee appointed herein has not considered the following documented information in making his recommendations on the extent of the fraud committed.

3.      Defendants committed many fraudulent conveyances under Section 4 of the Uniform Fraudulent Transfer Act. They miserably fail the" Badges of Fraud." test often cited in determining whether fraud exists. Having reviewed massive amounts of documentation over the course of the last few months, I have discovered a clear and continuing pattern of fraud in the form of documentary evidence sufficient to grant the relief that I seek.

## THE DEFENDANT JEFFREY TOGNETTI WITH ASSISTANCE FROM DEFENDANT LEIGH TOGNETTI, HIS EX-SPOUSE, CONTINUES TO USE THE MARITAL RESIDENCE TO OBTAIN FINANCING.

4.      Defendants had heretofore claimed in various affidavits that the defendants major asset, the 1.3 million dollar home located at 14 Blue Note Lane had been transferred from defendant Jeffery Tognetti to defendant Leigh Tognetti in the year 2002, and thereafter, in 2003, that it had been transferred to defendant Leigh Tognetti as part of a divorce settlement.

5.      However we have discovered that on December 13, 2004, well after the divorce was completed and well after the institution of the bankruptcy proceeding, the ex-spouse Leigh Ann Demelo (A/K/A Tognetti) inexplicably signed a mortgage on her home at 14 Blue Note Lane Stony Point NY 10980 for the benefit of her allegedly estranged husband, to secure a

Promissory Note dated December 9, 2004 between a company called Managed Auto Sales Inc. (Borrower) and AZNY Associates, LLC, a non- institutional financial lender for $150,000. This mortgage was recorded August 11, 2005.[1]

6. Managed Auto Sales Inc., was formed on January 15, 2004 and has its address as 203 Woodlands Drive Tuxedo NY 10987--- the same address listed as the new residence address of Defendant Jeffery Tognetti as well as her ex father in law, defendant Leno Tognetti. See Exhibit "B" annexed.

7. Moreover, AZNY Associates was formed 12/13/2004 and lists its address as c/o Barr & Haas, LLP 664 Chestnut Ridge Road Spring Valley NY 10977, that of the debtor's attorney. There is no filing under 2016(b) with respect to this transaction. See Exhibit "C".

8. Managed Auto Sales Inc. is the likely successor to L.I.C. Motors Inc. d/b/a Managed Auto Sales Corporation. That entity lists on its website the debtor, Jeffrey L. Tognetti, as the Management/Director/CEO and includes his personal phone numbers. The website shows that its name was a copyrighted from 2003-2005 .See Exhibit " D ".

9. The forgoing evidences the deceitful testimony elicited at the 341 hearing conducted on October 7, 2003. At that hearing which I attended, Tognetti states that he has been employed doing internet car sales. He names L.I.C. motors and separately a company he calls "Managed Auto" carefully not mentioning any "Inc" or "Corporation". Notably, no mention is made of this entity on the debtor's schedule B, line 13 either. See Exhibit "E" annexed. As will be shown below, the debtor conveniently excludes other material items from his Debtor's Schedules. A complete copy of the Debtor's Schedules and Statement of Financial Affairs is on file with the court. I will however, refer to just a few of the schedules for the purposes of this discussion all of which are attached hereto where indicated.

---

[1] Suspiciously, The mortgage is notarized not by her representatives, but rather by her estranged husband's attorney, Harvey Barr. See Exhibit " A ".

## THE DEBTOR AND HIS CO-CONSPIRATORS REGULARLY FORM NEW ENTITIES TO TRANSFER ASSETS OR DEFRAUD CREDITORS

10. The debtor and his father, co-defendant Lino S. Tognetti, have repeatedly formed new entities, and discretely transferred assets thereto to avoid creditors. These transfers were painstakingly identified to the court in the court papers that I transferred from the prior State Court action. Many of the older entities were set up for short duration and simply abandoned. No formal Notice of Dissolution were generally filed with New York State or other authority with respect to these entities.

11. Most recently, I have come to learn that the debtor formed an entity called Sell-It-Speedy, Inc. on December 10, 2004. [2]

12. It should be noted that Sell it Speedy is named as the debtor's employer on his Schedule I. There the address is also listed as 203 Woodlands Drive, Tuxedo NY 10987, the residence address of both the debtor and defendant Lino Tognetti. . See Exhibit "G". It is notably absent from his Schedule B as well.

13. The website for Sell it Speedy, Sellitspeedy.com, copyright 2003-2005, lists its address as address 222 Route 9W, Haverstraw NY 10927, not far from the debtor's previously owned headquarters at 117 Route 9W Haverstraw. Furthermore the telephone number listed on the website is identical to that on the Managed Auto Sales website. See Exhibit "H".

14. The address 203 Woodlands Drive Tuxedo NY appears once again on debtors Statement of Financial Affairs line 19A, as the location of his books, records and financial statements. This time however it lists this address as that of Victor Tartaglia, the former president of the broker/dealer ICAP, a wholly owned subsidiary of Jeffery Tognetti through his ownership of Syndicate Trading. He owned over 50% of Syndicate through an entity he owned

---

[2] Curiously, and once again, he official address listed is c/o Barr & Haas, LLP 664 Chestnut Ridge Road Spring Valley NY 10977, that of the debtor's attorney. See Exhibit "F ".

called Jefal Partners LLC (also not on his Schedule B). It is incredulous to suggest as defendants do that, Tartaglia resides at or maintains offices at 203 Woodlands Drive Tuxedo NY. The alleged home of both Jeffery Tognetti and his father Lino Tognetti.

15. Over a period of years, the debtor has created a web of entities. A listing of entities formed by the debtor is included in Exhibit "I". A cursory review of the tax return schedules filed by Tognetti through Syndicate Trading LLC will show how often he shifted money or capital from one entity to another.

16. Debtor should not be able to shield himself from liability through the creation of multiple entities all controlled by him.

## THE DEBTOR CONTINUED TO DEMONSTRATE CONTROL OF THE MARITAL RESIDENCE ON SEVERAL OTHER OCCASSIONS

17. In December, 2002 just days after transferring his interest in the Blue Note Lane property to his wife, he executed a mortgage on the property for $ 500,000. Replacing the prior $ 350,000 mortgage and thereby removing $150,000 in equity. See Exhibit " J ". Soon after the Blue Note Lane property was transferred in November 2002, defendant Demelo-Tognetti placed the home on the market for sale. In January 2003 the property was listed for $1,250,000. It is now on the market for $1,350,000. It should also be noted that Demelo-Tognetti is the agent listing the home. See Exhibit "K".

18. On June 17, 2003, well after his transfer of the house, after his alleged separation agreement was signed, and within 6 days of the effective date of the divorce, in an affidavit he submitted to the New York Supreme Court, he stated in sum and substance that he had the right and the ability to refinance this property. In paragraph #6 of the affidavit he states:

> "In the alternative to 5(D) above, I request that the Court cancel the lis pendence on 14 Blue Note Lane, Stony Point NY and allow *me* (emphasis added) to refinance that property, and then reinstitute the lis pendence on that property, or from that refinancing post $145,000 of the monies realized to cover the lis pendence."

19. The entire affidavit of Tognetti is annexed hereto as Exhibit " L". If Tognetti had truly transferred the property, as has been his legal position, he could not use it as collateral.

### THE TERMS OF THE DIVORCE WERE SETTLED WELL AFTER THE HOUSE WAS TRANSFERRED AND A JUDGMENT AGAINST THE DEBTOR WAS OBTAINED. THERE WAS NO BONA FIDE AGREEMENT OR EQUITABLE DISTRIBUTION

20. I obtained a judgment against the debtor, Jeffrey L. Tognetti on November 15, 2002 and obtained an *order of attachment* on November 26, 2002. Just days later, the debtor deeded the title to his wife for no consideration.

21. Defendant Leigh Ann Demelo indicated in her affidavit dated February 2003 at paragraph 6, "my dealings with Jeffrey Tognetti have been pleasant and it appears we may have an uncontested divorce when some issues are ironed out." See Exhibit "M ".

22. The parties did not separate or sign a separation agreement until April 15, 2003 and did not obtain a judgment of divorce until June 23, 2003. Indeed, the debtor continued to reside in the home as the divorce order states. Had this been a contentious divorce, the debtor could have moved in with his parents, as he claims he has done, much earlier. See Exhibit "N"

23. Curiously, the agreement states that " the husband shall be responsible for all carrying charges of the home, including, but not restricted to the mortgage, property taxes, utilities and general maintenance."

24. It must have been difficult to pay these bills without a bank account. The debtor states in his Statement of Financial Affairs in October 2003, line 11, that his only bank account, held at Chase Bank in Nanuet NY was closed in October 2002. See Exhibit "O"

25. The parties claim that the transfer of the house was part of an equitable distribution agreement. The marriage was of a very short duration- just over three years. According the debtors Statement of Financial Affairs, line 1, he had no income, only losses for the years 2001, 2002, and 2003.See exhibit "P". The marriage took place in July 1999. In a contested divorce, not like this "settled matter", the courts would never have awarded the wife the entire equity value in a home of $1,000,000. (The $1,350,000 less the mortgage of $350,000 before the refinance). Especially when the husband claims to have minimal earnings for the periods preceding the divorce.

26. The parties do not submit in exhibits to their divorce agreement any Statements of Net Worth in these filings.

27. I believe the irrevocable trust set up by the debtor and listed on his Schedule B, line 9, may contain at least a portion, possibly substantial, of his pre-filing assets .See exhibit xxx.

### THE DEBTOR AND THE OTHER DEFENDANT HAVE NOT BEEN FORTHCOMING TO THE COURT OR THE TRUSTEE IN DESCRIBING THE ORIGINAL SOURCE OF FUNDING OR CHAIN OF TITLE TO THE HOUSE

28. In several affidavits submitted by the defendants, they have claimed that the marital residence at 14 Blue Note Lane Stony Point NY 10980 was purchased originally by the

spouse, Leigh Ann Demelo, in 1998 and that she alone was the source of funds for this house. Despite having had two children with the debtor Jeffrey Tognetti as early as 1996, she indicated in an affidavit that she purchased the home alone prior to the July 1999 marriage. She also swore that when the debtor husband needed money for legal fees in his criminal securities matter, for which he was convicted of a felony, the house had to be transferred back into both his and her name because they needed his income to obtain a mortgage.

29. She further indicates that a mortgage was taken out at the time of the initial purchase and that the mortgage was paid in full in less than one year. She fails to divulge who paid that mortgage and how.

30. The actual events, concerning the ownership, and dates of mortgages are quite different from the story told by the defendants. I include a graphical depiction of the actual chain of title with supporting recording certificates referenced. As the court should note, the residence was purchase was made on April 20, 1998 in the name of Leigh Ann Demelo and was transferred on May 21, 1998 to the Jeffal Family LP. Leigh Ann Demelo and Jeffrey Tognetti are the partners signing for Jeffal. See exhibit "J".

31. The mortgage of $ 310,000 was satisfied on June 18, 1999. The house was transferred back from Jeffal Family LP on October 4, 1999 to Demelo and Tognetti as husband and wife. On October 25, 1999, a mortgage for $ 350,000 was obtained in both names.

32. The husband and wife transferred the house back to Demelo-Tognetti alone on November 27, 2002 recorded December 2, 2002 as Leigh Ann Demelo Tognetti to Leigh Ann Demelo Tognetti. This occurred the day after the court granted me a judgment against Jeffrey Tognetti.

32. In the same month, without regard to who the fee owner in title actually was at the time, both Demelo and Tognetti signed a new refinance mortgage with Ameriquest for $ 500,000 replacing the $ 350,000 former mortgage.

33. The Village of Pomona placed a lis pendence in the name of Jeffrey Tognetti on March 30, 1998 on the property which was alleged to have also been owned exclusively by Demelo. In his 10/7/2003 341 hearing, Tognetti states that he had paid some mortgage payments on this house, but could not recall how much.

## THE INTENT OF THE STIPULATION OF SETTLEMENT AND ITS TERMS ARE CLEAR. THE DEFENDANTS MATERIALLY MISREPRESENTED THEMSELVES.

34. The Supreme Court permitted me to file lis pendence and other attachments against all of the debtor's property. See Judge Barone's decision annexed hereto as Exhibit "Q".

35. When this was accomplished the defendants and their attornies as a group approached me to settle the underlining Supreme Court action. Indeed the we agreed to a fixed amount to be paid and as importantly the defendants agreed to waive and or withdraw any and all defenses with respect to this action. A copy of the stipulation annexed hereto Exhibit "R".

36. The defendants had no intention to honor the terms of the settlement agreement.

## THE NON-DEBTOR DEFENDANT, LINO TOGNETTI, HAS RECENTLY USED THE DEVICE OF CREATING A NEWLY FORMED ENTITY TO DEFRAUD CREDITORS

37. To avoid claims made by several creditors on the commercial properties improperly conveyed from the debtor's company, Syndicate Trading LLC, to his own name, the non-debtor defendant Lino Tognetti, formed an entity called LST Realty Inc.

39. Lino then transferred title from his name to LST Realty Inc. despite my filing of a lis pendence and despite other creditors having liens against the property.

40. Thereafter, as part of a scheme, LST Realty Inc. offered to settle my claim at a discount, and made representations to me that the proceeds would be sufficient to cover this reduced claim and that that they had free and clear title. This was a false representation.

41. The actual liens encumbering the property were later determined to be far in excess of the representations made by Lino. I received only $ 40,000 of the 160,000 net proceeds (and only a fraction of the 205,000 that I was owed), from the total net proceeds of the sale of the two properties. Moreover, from the transfer by Lino to LST, the claim of one lienor, Deutsch Coffey & Metz, for $ 145,000 was completely excluded and not paid.

42. Moreover, the ultimate purchasers of the commercial properties heretofore described were the exact same buyers as from the contract one year earlier. More revealing, the price and terms had not changed to these buyers, even though we were in an upwardly spiraling real estate market. Additionally, the purchasers were both from Stony Point NY, the hometown of the Tognetti's.

43. Most importantly, in retrospect, the defendants knew at that time that the net proceeds could never have been sufficient to cover the original stipulation amount of $205,000.

## THE DEFENDANTS HAVE EXHIBITED AN EXTRAORDINARY AND CONTINUING PATTERN OF DECEIT

44. Over a period of eight years, both the number and nature of lawsuits filed against the debtor and the defendants are staggering. Even his own attorney, Barr & Haas, LLP, sued him in 2002, before representing him in this action.

45. The debtor has been convicted of a felony for securities fraud and has falsely stated that he received clemency for making restitution

46. The debtor defied the NY Supreme Court order cited above in Exhibit "Q".

47. He was not permitted to be trading in a firm account per his conviction, yet he s hows losses from his securities trading at Syndicate Trading LLC/ ICAP as per his Statement of Financial Affairs Question #1.

48. The trail of ownership of the marital residence completely contradicts any and all testimony from the debtor and his non-debtor spouse.

49. The father, Lino Tognetti, transferred the commercial properties between himself, the debtor, the debtor's company Syndicate Trading LLC and another debtor controlled entity Jefal Realty inc., over 5 times in less than 5 years before finally transferring the property to his newly formed entity LST Realty Corp. He then immediately filed for Chapter 11. A careful look at these transactions as per debtor's 11/25/2003 affidavit and his 341 meeting reveal very unusual transactions and prices between the parties.

50. In one deed of sale, Lino Tognetti signs as the Managing Member of Syndicate Trading LLC. He never was the Managing Member. He was a $ 60,000 a year employee who the debtor put on the management committee. As noted, he was able to assistance in the transfer of properties as needed and always to his benefit.

51. The debtor falsely states in the affidavit of November 25, 2003 in para (aa) that the sale of the properties per our stipulation could have gone forward despite a newly discovered lis pendence in that "the title company agreed to escrow $ 50,000 and permit the closing to go forward". However, in the just discovered June 17,2003 affidavit, para 3(B), the debtor acknowledges a lien of $145,000 and that the Chicago Title Insurance Company will not allow the sale to go through until the lis pendence is lifted. See Exhibit "S".

52. After the house was transferred to his wife, the debtor co-signed a mortgage with Ameriquest, a de facto fraud.

THE CONFLUENCE OF SEVERAL BADGES OF FRAUD SHOWS CONCLUSIVE INTENT TO DEFRAUD

53. The debtor claims his transfer was not with intent to defraud. The questions one must consider in determining whether there is actual intent to defraud can be found according to my attorney, in Section 4 of the Uniform Fraudulent Transfer Act. Section 4(b) lists the series of questions one must consider in determining whether fraud exists. If the defrauding party can be recognized by the categories below, fraud must be inferred:

1) the transfer or obligation was to an insider;

The transfers were to insiders, his wife and father.

2) the debtor retained possession or control of the property transferred after the transfer;

The debtor continued to use the property to obtain financing. He also retained possession of the house long after he would have been expected to vacate it.

3) the transfer or obligation was not disclosed or was concealed;

The transfer of title was concealed and enabled the debtor to obtain a new mortgage after the date of transfer. Also noted is the transfer of the deed is recorded on December 2, 2002 as Leigh Demelo Tognetti to Leigh Demelo Tognetti.

4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

Just a day before the transfer, I obtained a judgment against the debtor and an order of attachment on the house. He also apparently was involved in several other lawsuits.

5) the transfer was of substantially all the debtor's assets;

In fact, upon a full search of all accounts in every bank and 18 brokerages in Rockland and Orange counties in New York in the debtor's social security number, we were unable to find any assets at all. Per his Debtor's Statement of Financial condition, he closed his last pre-petition bank account in October 2002.

6) the debtor absconded.

He did not abscond.

7) the debtor removed or concealed assets;

As stated above, he closed his bank accounts. Also, we are unable to locate the remainder of his "significant capital account". In addition, the debtor's ability to hide his identity behind various entities makes his concealment difficult to undo. He did however remove other assets such as the corporate properties which led to the signing of the stipulation.

8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

The value received by the debtor is not equivalent or a bona fide contested value. As noted above the defendants claim that the transfer of the house was part of an equitable distribution agreement. The marriage was of a very short duration- just over three years. According the debtors Statement of Financial Affairs, line 1, he had no income, only losses for the years 2001, 2002, and 2003.See exhibit xxx. The marriage took place in July 1999. In a contested divorce, not like this "settled matter", the courts would award the wife a fraction of the value of half an equity value in a home of $1,000,000.

9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

With no traceable assets, the debtor became insolvent upon the transfer.

10) the transfer occurred shortly before or shortly after a substantial debt was incurred;

I had just received a judgment for $127,000.

11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The assets were transferred to an insider.

## THE TRUSTEE HAS STATED THAT HE RELIED UPON THE DOCUMENTS PRODUCED BY THE DEBTOR'S ATTORNEY TO SUCCESSFULLY INTEROGATE THE DEBTOR AND HIS TRANSACTIONS. WE CAN CONCLUSIVELY PRESENT VITAL INFORMATION TO SHOW THE TRUSTEE DEFAULTED IN HIS DUTIES

54. The trustee states that he relied upon the debtor's attorney and has refused to bring a fraudulent transfer claim against the debtor despite our requests. I also provided a list of bank account numbers which were regularly receiving transfers from the debtor's company before its liquidation. See Exhibit "V"

55. The nature of the answers to determine the intent of a fraudulent transfer provides conclusive evidence that such a transfer was with intent to defraud. The act calls for consideration of some factors. Here, the overwhelming evidence affirms at least 9 out of 11 factors that there was intent to defraud. However, the trustee has not pursued that claim.

56. The trustee fails to seek out several other assets the debtor has shown including his rights to several assets from the liquidation of entities now claimed to be defunct by the debtor. The trustee even failed to obtain the furniture and fixtures to be sold for the estate after the debtor told him the physical whereabouts of the property in his 341.

57. Valuable proprietary software developed by an entity controlled by the debtor, Traderoute Direct LLC, is currently being used by a company now named BonTrade Solutions in

New Jersey (973-429-3741). The debtor claimed in his 10/7/2003 341 hearing that the software was worth "substantive value". He listed TradeRoute Direct LLC on his Schedule B as defunct. I informed the trustee where to find this valuable debtor asset. In fact, in his 11/25/2003 affidavit para (w) the debtor told the Trustee where to locate the software. The former director for TradeRoute Direct is named John Paul DeVito. He may be found at Bon Trade. See exhibit " T ".

58. In appears the trustee expended no time or effort in determining if the liquidation or dissolution of any affiliated entities of the debtor was properly administered. The debtor should forfeit and sign over all claims he may have on those assets to the estate on behalf of the creditors.

59. Trustee did not interview former corporate accounting firm J.H. Cohn, CPA,s nor former corporate counsel Dan Druz, who was responsible for the liquidation of the assets of Syndicate Trading LLC. Druz can probably explain what happened to the debtor's "significant capital account" Tognetti refers to in his very telling affidavit dated February 14 2003 whereby he tells the court he was entitled to large withdrawals through late 2002 from his account in Syndicate Trading LLC and See Exhibit "U" para 16.

60. From my investigation of cash transfers from one of the primary checking accounts of Syndicate Trading LLC in the period from January 2002, the date I was to have my capital returned, through September 2002, just before the firm ceased operations, I found cash transfers to LeighAnn Demelo, Jefal Realty Inc and the irrevocable trust totaling $150,000. That was

while the debtor was losing money trading as per his Statement of Financial affairs line 1. Perhaps much more went to fund his irrevocable trust upon final liquidation, as he did not have a pre-petition bank account as of October 2002. See Exhibit "W".

61. To date, no determination has been made with respect to Tognetti's tax situation. If he had actually made substantial sums in the past as he claims, his losses from 2001, 2002 and 2003 could provide him a tax refund. If he actually did not have large gains in the past, then he lied on his affidavit or he failed to pay his income tax, as he should have.

62. It now appears that the debtor's schedules are so littered with lies it is a wonder the trustee did not dismiss for abuse under Sec. 707.

63. The actions described herein would certainly have benefited the estate. Wherefore it is respectfully requested that my motion be granted in its entirety

_____
Eric Ross

Notary Public

Sworn to before me this 16th day
Of December, 2005

STEVEN LANDY
Notary Public, State Of New York
No. 4948434
Qualified In Westchester County
Commission Expires March 20, 20__

S:\wpdocs\lit\motions\ross-12-15\Ross Affidavit Final 121605.doc         17